The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on August 19, 2019, which may be different from its entry on the record.

**IT IS SO ORDERED.**

**Dated: August 19, 2019**



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ERICK ETIENNE LaGROUX, | ) | Case No. 17-40198 |
|     Debtor. | ) | |
| | ) | Judge Arthur I. Harris |
| | ) | |
| ALLCARE MEDICAL SERVICES, | ) | |
| LLC, | ) | Adversary Proceeding |
|     Plaintiff. | ) | No. 17-4045 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL D. BUZULENCIA, | ) | |
| TRUSTEE, | ) | |
|     Defendant. | ) | |

MEMORANDUM OF OPINION[1]

In this adversary proceeding, AllCare Medical Services, LLC ("AllCare")

seeks a declaratory judgment that (1) the debtor, Erick Etienne LaGroux, withdrew

---

[1] This Opinion is not intended for official publication.

from AllCare prior to filing for bankruptcy, (2) Ohio law and AllCare's operating agreement control LaGroux's estate's interest in AllCare, and the trustee must comply with the buyout and first-refusal provisions of the operating agreement, and (3) AllCare owns the eight domain names LaGroux purchased on behalf of AllCare. For the reasons that follow, the Court finds that (1) LaGroux's estate only has an economic interest in AllCare because LaGroux withdrew from AllCare prior to filing for bankruptcy, (2) Ohio law and the operating agreement control LaGroux's estate's interest in AllCare, and the trustee must comply with the terms of Ohio law and the operating agreement, and (3) LaGroux's estate only has a bare legal interest in the eight domain names that LaGroux purchased.

## JURISDICTION

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). The Court has jurisdiction over core proceedings under 28 U.S.C. §§ 1334 and 157(a) and Local General Order 2012-7 of the United States District Court for the Northern District of Ohio. On March 12, 2018, the defendant-trustee consented to the Court's entry of final judgment. On October 23, 2018, AllCare consented to the Court's entry of final judgment.

2

# PROCEDURAL HISTORY

On February 9, 2017, LaGroux filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (Case No. 17-40198). Michael D. Buzulencia ("the trustee") was appointed as trustee in the underlying bankruptcy case. The trustee's interim report indicated that LaGroux held a 25% membership interest in AllCare (Case No. 17-40198, Docket No. 38).

On September 6, 2017, LaGroux filed amended schedules (Case No. 17-40198, Docket No. 21). Schedule A/B was amended to include the eight domain names that LaGroux purchased on behalf of AllCare, and the value of the domain names was listed as unknown.

AllCare initiated this adversary proceeding on December 6, 2017 (Adv. No. 17-4045). Prior to trial, AllCare dismissed its claims against the debtor and all parties except the trustee. On February 6, 2019, the Court denied AllCare's motion for partial summary judgment. The Court held a trial on March 29, 2019, and June 19, 2019. The Court heard testimony from the debtor and the trustee at trial. The Court permitted the *de bene esse* deposition of Sharon Gobbi, a member and the Chief Operating Officer of AllCare, to be taken on May 2, 2019, because her medical condition prevented her from traveling from Long Island, New York, to Youngstown, Ohio. The Court received joint stipulated exhibits 1–6 subject to

3

redaction under Bankruptcy Rule 9037 and received without objection AllCare's exhibits 1–8 and the trustee's exhibits A–G. The Court also received the transcript of Ms. Gobbi's deposition subject to redaction related to her medical condition and with the stipulation that her medical condition prevented her from traveling to Youngstown, Ohio. This memorandum constitutes the Court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

The Court notes that AllCare has not asked the Court to determine the value of the bankruptcy estate's interest in AllCare. Rather, AllCare seeks a declaratory judgment that LaGroux withdrew from AllCare before filing for bankruptcy, that Ohio law and the operating agreement control the bankruptcy estate's interest, and that the domain names are property of AllCare. The Court intends for this opinion to serve as a final judgment subject to appeal.

FINDINGS OF FACT

The findings of fact contained in this memorandum of opinion reflect the Court's weighing of the evidence, including the credibility of each witness. In doing so, "the court considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language or nuance of expression."

4

*In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court considered the testimony of the trial witnesses and the exhibits and transcripts admitted into evidence. Unless indicated otherwise, the following facts were established at trial by a preponderance of the evidence or were stipulated to by the parties.

AllCare is an Ohio limited liability company that was organized on May 17, 2016, originally as UMS Health Services, LLC. On July 14, 2016, the LLC changed its name to AllCare Medical Services, LLC. The founding members were LaGroux, Rob Simmons, and Dr. Daniel Ferrara. During 2015 and 2016, LaGroux purchased eight domain names under his own name for use by AllCare, paying between $7 and $14 for each. LaGroux purchased these domain names prior to the creation of an operating agreement for AllCare. LaGroux never attempted to license or sell the domain names to AllCare, but instead purchased them for AllCare's use. LaGroux was not compensated by AllCare for the purchase of the domain names or for the fees he paid to renew the domain names through 2019.

On August 10, 2016, the members of AllCare entered into an operating agreement. The operating agreement indicated that originally LaGroux and Mr. Simmons both held a 37.5% membership interest and Dr. Ferrara held a 25% membership interest.

5

In October 2016, Ms. Gobbi became a member and the Chief Operating Officer of AllCare. LaGroux and Mr. Simmons each sold 12.5% of their membership interests to Ms. Gobbi at $1 per unit. The sale to Ms. Gobbi left each of the four members of AllCare holding a 25% interest. When Ms. Gobbi joined AllCare, she requested all of the passwords for each of the AllCare domain names, and LaGroux gave her each of those passwords. Ms. Gobbi had access to the domain names with these passwords until LaGroux filed for bankruptcy.

On November 3, 2016, at 4:21 P.M., LaGroux emailed Ms. Gobbi and Mr. Simmons with a subject line that read "Immediate Resignation." The email stated:

> I am making my resignation from AllCare effective as of 6pm this evening. I will cease all interactions with Associate Vendors and staff immediately as well as clients. All property will remain in the office with the exception of my personal belongings. If Josh would like to supervise the cleaning of my office tomorrow, then that is fine. Please advise[.]

> My apologies for the way this has ended, however it is not fair to the nurses to lose their jobs over harm that [my family and I] have caused.

> Please make this company a success.

After receiving advice from an attorney, on November 4, 2016, LaGroux sent a second email to Ms. Gobbi and Mr. Simmons with a subject line that read

6

"Unresignation."  This email indicated that LaGroux wished to "unresign" from

AllCare, effective immediately:

> This e mail is [to] notify all parties involved, that I Erick LaGroux,
> President of AllCare Medical Services and current equity holder of
> AllCare, effective immediately[, . . .] am unresigning for the
> following reasons . . . .
>
> * * * *
>
> I do not relinquish my ownership piece or office of AllCare Medical
> Services for the above reasons.

That same day, Ms. Gobbi emailed LaGroux in response, stating:

> [W]e received an email from you indicating you wish to "un-resign".
> Upon review of said email, along with other (numerous) concerns and
> the nature of them, we the remaining partners cannot, without any
> possibility, accept your "un-resignation" as requested today.  The
> resignation is and will remain in effect indefinitely.

Mr. Simmons and Dr. Ferrara were also included as recipients of Ms. Gobbi's

email to LaGroux.

Sometime during or around December 2016, LaGroux began working as a

consultant for Greenleaf Travel Nurse Staffing, LLC ("Greenleaf"), a direct

competitor of AllCare.

On February 9, 2017, LaGroux filed a voluntary petition for relief under

Chapter 7 of the Bankruptcy Code.  On Schedule A/B filed with his petition,

7

LaGroux indicated that he held a 25% membership interest in AllCare with an unknown value.

LaGroux did not list the domain names as assets on his original Schedule A/B. LaGroux also did not discuss the domain names at his 341 meeting of creditors held on March 29, 2017. On September 6, 2017, LaGroux amended Schedule A/B to include the domain names. Additionally, sometime after filing for bankruptcy, LaGroux changed the passwords to the domain names so that Ms. Gobbi no longer had access. LaGroux paid to renew each domain name through 2019. Although LaGroux purchased and put the domain names in his name personally, LaGroux testified at trial that he believed he was maintaining the names for AllCare.

On June 9, 2017, Mr. Simmons sold the entirety of his 25% membership interest in AllCare to Ms. Gobbi at $1 per unit. Sometime after this, Ms. Gobbi sold a 12.5% membership interest in AllCare to Dr. Ferrara at $1 per unit.

AllCare initiated this adversary proceeding on December 6, 2017.

CONCLUSIONS OF LAW

*A. LaGroux's Withdrawal from AllCare*

Chapter 1705 of the Ohio Revised Code contains Ohio's provisions regarding limited liability companies ("LLCs"). Although this chapter provides

8

terms regarding the operation and relations of LLCs, these terms only come into effect if the LLC's operating agreement does not provide for a certain term. Ohio Rev. Code § 1705.081.

AllCare's operating agreement states, in pertinent part:

**Duty of Loyalty**
15. Any Member may invest in or engage in any business of any type, except a business that is similar to the business of the Company. Neither the Company nor any Member will have any right to that opportunity or any income derived from that opportunity.

\* \* \* \*

**Admission of New Members**
19. No new Members may be admitted into the Company without unanimous consent of current members.

**Voluntary Withdrawal of a Member**
20. Where the Company consists of two or more Members, the voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

It remains incumbent on the withdrawing Member to exercise this dissociation in good faith and to minimize any present or future harm done to the remaining Members as a result of the withdrawal.

**Involuntary Withdrawal of a Member**
21. Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; breach of fiduciary duties by a Member; criminal conviction of a Member; Operation of Law against a Member or a legal judgment against a Member that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. . . .

9

## Dissociation of a Member

22.  In the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will Purchase on a pro-rata basis in accordance with the percentages owned by the non-withdrawing members.  If one chooses not to purchase, the other may purchase all the withdrawing member's interest. . . . The purchase amount of any buyout of a Member's interest will be determined as set out in the Valuation of Interest section of this Agreement.

* * * *

## Right of First Purchase

23. In the event that a Member's Interest in the Company is or will be sold, due to any reason, the remaining Members will have a right of first purchase as well as right of first refusal of that Member's Interest to a third party.  The value of that interest in the Company will be the lower of the value set out in the Valuation of Interest section of this Agreement and any third party offer that the Member wishes to accept.

* * * *

## Valuation of Interest

25. In the event of a dissociation or the dissolution of the Company, each Member will have an equal financial interest in the Company.

In the absence of a written agreement setting a value, the value of the Company will be based on the fair market appraisal of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP).  This appraisal will be conducted by an independent accounting firm agreed to by all Members.  An appraiser will be appointed within a reasonable period of the date of withdrawal or dissolution.  The results of the appraisal will be binding on all Members.  The intent of this section is to ensure

10

the survival of the Company despite the withdrawal of any individual Member.

No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

Thus, pursuant to the operating agreement, a member of AllCare can either voluntarily or involuntarily withdraw. A violation of a fiduciary duty, such as the duty of loyalty, results in the involuntary withdrawal of a member. For a voluntary withdrawal, the operating agreement does not specify the manner by which a member must give notice for the withdrawal to be effective. Additionally, the operating agreement requires that the addition of a new member must be consented to unanimously by the current members.

AllCare's operating agreement is silent as to the right to participate in the management and conduct of AllCare after a member's withdrawal. But under Ohio law, "[u]pon a member's withdrawal from a limited liability company, the member's right to participate in the management and conduct of the limited liability company's business terminates." Ohio Rev. Code § 1705.161.

The Court finds that LaGroux withdrew his membership in AllCare when he sent his resignation email. LaGroux sent his resignation email to Ms. Gobbi and Mr. Simmons on November 3, 2016, stating that he was "making [his] resignation from AllCare effective as of 6pm [that] evening." Pursuant to AllCare's operating

11

agreement, a member can withdraw voluntarily. Because the operating agreement does not provide any provision regarding the manner by which a member must withdraw, Ohio Revised Code Section 1705.16 controls, which provides that a member may withdraw by giving written notice. Thus, his email is sufficient for providing notice of his withdrawal. In addition to his statement of resignation, the email also indicated that he would remove all of his personal property from his office and would stop communicating with various parties associated with AllCare. LaGroux also told Ms. Gobbi and Mr. Simmons to "make this company a success," which implies that LaGroux himself would not be involved in making AllCare a success in the future.

LaGroux's unresignation email also demonstrates his earlier intent to resign both as a member and as president. In his "unresignation" email dated November 4, 2016, LaGroux stated, "I do not relinquish my ownership piece or office of AllCare Medical Services for the above reasons." This language indicates that LaGroux recognized that his previous resignation email gave up his ownership piece—his membership interest—as well as his position as president and that he wished to reverse that resignation. The trustee argues that LaGroux's testimony at trial is supportive of the position that LaGroux only intended to resign his position as president. The Court finds that the "unresignation" email is more probative of

12

LaGroux's intent when he resigned than his testimony at trial, nearly two and a half years later, agreeing to counsel's statements that he only wished to resign as president of AllCare.

LaGroux's unresignation email was not effective in reinstating his status as a member of AllCare. The member who withdrew would only become a member again according to the operating agreement's provision regarding the addition of new members. AllCare's operating agreement states that the addition of new members requires the unanimous consent of the current members. Because LaGroux was no longer a member at the time he attempted to "unresign," he could only be reinstated as a member if all of the remaining members—Ms. Gobbi, Mr. Simmons, and Dr. Ferrara—unanimously consented to it. However, in response to his "unresignation" email, Ms. Gobbi indicated that the remaining members "received and accepted" LaGroux's resignation and "[u]pon review of said email, along with other (numerous) concerns and the nature of them, we the remaining partners cannot, without any possibility, accept your 'un-resignation' as requested today. The resignation is and will remain in effect indefinitely." This email demonstrates that the remaining members did not unanimously consent, meaning the "unresignation" email did not reinstate LaGroux's membership in

13

AllCare. Therefore, the Court finds that AllCare has established by a preponderance of the evidence that LaGroux resigned as of November 3, 2016.

Because the Court finds that LaGroux withdrew from AllCare when he sent his November 3, 2016, resignation email, the Court does not need to determine whether LaGroux involuntarily withdrew from AllCare when he began working as a consultant for Greenleaf sometime around December 2016. However, LaGroux's work with Greenleaf is demonstrative of what he believed his relationship to AllCare was at that point. AllCare's duty of loyalty provision states, "[a]ny Member may invest in or engage in any business of any type, except a business that is similar to the business of the Company." LaGroux admitted at trial that Greenleaf is in the same business as AllCare. As AllCare's duty of loyalty provision does not allow LaGroux to invest or engage in any business with a competitor, LaGroux would have known that he would have been in violation of AllCare's operating agreement by working as a consultant for Greenleaf. Because he likely would not have acted in violation of the operating agreement if he believed he still had a noneconomic interest in AllCare, it is more likely that LaGroux believed that he only had an economic interest in AllCare at that time.

Therefore, the Court finds that LaGroux withdrew his membership in AllCare voluntarily when he sent his resignation email. Because his November 3,

14

2016, resignation email was sent and received by the members of AllCare prior to LaGroux filing for bankruptcy on February 9, 2017, the Court finds that LaGroux withdrew from AllCare and terminated his right to participate in the management and conduct of AllCare prior to filing his bankruptcy petition. As a result, LaGroux's estate only includes an economic interest in AllCare and does not include any noneconomic interest.

While the trustee notes that AllCare has continued to show the trustee as a member on various tax returns, nothing about this fact is inconsistent with LaGroux and now the trustee retaining only an economic interest in AllCare. Until that interest can be sold under the terms of the operating agreement, a process which the trustee has thus far balked at, the trustee presumably remains a member of AllCare for tax purposes, even though LaGroux and the trustee have no right to participate in the management and conduct of the LLC's business.

### B. Ohio Law and the Operating Agreement Control

The trustee made additional arguments that Ohio law and AllCare's operating agreement are only applicable to the extent that they do not conflict with federal bankruptcy law. Specifically, throughout the proceeding, the trustee has argued that any provision in the operating agreement that was triggered by LaGroux filing bankruptcy and led to his dissociation is an *ipso facto* provision and

15

should not permitted to prevent the transfer of LaGroux's interest to LaGroux's estate. The trustee also maintains that the trustee cannot be forced to sell LaGroux's interest to AllCare at a "poison pill" price and that LaGroux's estate has a right to the appreciation in value of LaGroux's economic interest. Finally, the trustee contends that LaGroux's estate had a right to be offered the opportunity to purchase Mr. Simmons's shares when he withdrew from AllCare.

### 1. The Operating Agreement as an Executory Contract and *Ipso Facto* Provisions

The Bankruptcy Code disapproves of statutory and contractual provisions that are triggered by the commencement of a bankruptcy case, known as *ipso facto* provisions. Section 541 of the Bankruptcy Code therefore operates to prevent *ipso facto* provisions from taking effect and contravening the Code's purposes. 11 U.S.C. § 541; *In re W.R. Grace & Co.* 475 B.R. 34, 152–53 (D. Del. 2012); *Warner v. Warner*, 480 B.R. 641, 655 (Bankr. N.D. W. Va. 2012). Under Section 541, all of the debtor's interests are vested with the bankruptcy estate notwithstanding applicable nonbankruptcy law or contractual provisions effecting a modification or termination of the debtor's interest upon filing. *Klingerman v. ExecuCorp, LLC et al.* (*In re Klingerman*), 388 B.R. 677, 678–79 (Bankr. E.D.N.C. 2008). "[A]ll of the rights and privileges that the debtor had immediately prior to filing [become] the property of the bankruptcy estate."

16

*LaHood v. Covey (In re LaHood)*, 437 B.R. 330, 336 (C.D. Ill. 2010) (citing

*In re Garrison-Ashburn, LC*, 253 B.R. 700, 707–08 (Bankr. E.D. Va. 2000)).

Section 365(e)(1) similarly invalidates *ipso facto* provisions in an executory

contract. *Warner*, 480 B.R. at 649–50 ("Section 365(e)(1) invalidates *ipso facto*

provisions that prevent the bankruptcy estate from receiving the benefit of an

executory contract.") (citation omitted).

The Court finds it unnecessary to determine whether the operating

agreement is an executory contract or whether there is an *ipso facto* provision in

AllCare's operating agreement that would result in a noneconomic interest in

AllCare vesting with LaGroux's estate. The Court has determined that LaGroux

withdrew from AllCare prior to filing bankruptcy. This means that LaGroux gave

up his noneconomic interest in AllCare upon his withdrawal and only held an

economic interest at the time of filing. Because LaGroux only possessed an

economic interest when he filed for bankruptcy, LaGroux's estate similarly can

only hold an economic interest. *See Mission Prod. Holdings v. Tempnology, LLC*,

139 S. Ct. 1652, 1663 (2019) ("In preserving those rights, Section 365 reflects a

general bankruptcy rule: The estate cannot possess anything more than the debtor

itself did outside bankruptcy. . . . As one bankruptcy scholar has put the

point: . . .'A debtor's property does not shrink by happenstance of bankruptcy, but

17

it does not expand, either.' ") (citations omitted); *see also In re Fair Finance Co.*, 834 F.3d 651, 676 (6th Cir. 2016) (trustee stands in the shoes of the debtor, and defenses can be raised against a bankruptcy trustee to the same extent they could have been raised against the debtor prior to the filing of bankruptcy).

### 2. Right of First Purchase and Valuation Provisions

Section 363(l) of the Bankruptcy Code states that a trustee may sell property under Section 365:

> notwithstanding any provision in a contract . . . or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under [Title 11] or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

AllCare's operating agreement gives the remaining members of AllCare a right of first purchase and sets forth the procedures for the valuation (Operating Agreement Paragraphs 23 and 25).

The trustee asserts that the right of first purchase in AllCare's operating agreements is an *ipso facto* provision and thus is not enforceable. However, the right of first purchase requirement is not "triggered by a member's insolvency, bankruptcy filing, or by the appointment of a trustee or custodian." *In re Talbut*, No. 08-34763, 2015 WL 5145598, at *5 (Bankr. N.D. Ohio Aug. 28, 2015); *see*

18

*In re Capital Acquisitions & Mgmt. Corp.*, 341 B.R. 632, 637 (Bankr. N.D. Ill. 2006) (finding that the right of first refusal was not an unenforceable *ipso facto* provision because it was not triggered by the debtor's bankruptcy filing). Instead, the right of first purchase provision is in effect any time a member withdraws from AllCare and is not an *ipso facto* provision. At the time LaGroux withdrew from AllCare prior to his bankruptcy filing, LaGroux was required to comply with this provision of the operating agreement. Thus, the trustee in this case is not excused from complying with this provision of the operating agreement.

The trustee also asserts that LaGroux's withdrawal would not impact the valuation of LaGroux's estate's interest in AllCare and that the estate is entitled to the appreciation in value of LaGroux's interest from the time LaGroux withdrew from AllCare until the date of the valuation. AllCare has not asked the Court to determine the value of the bankruptcy estate's interest in AllCare. Nor has the trustee sought any affirmative relief in this adversary proceeding. Therefore, the Court need only decide whether the valuation determination is governed by applicable Ohio law and AllCare's operating agreement. The short answer to that question is yes. Ohio law and AllCare's operating agreement control LaGroux's estate's interest in AllCare, and the trustee must comply with the buyout, first-refusal, and valuation provisions of the operating agreement.

19

### 3. Purchase of Mr. Simmons's Shares

Although the trustee disagrees with AllCare's assertion that the LLC's shares should be valued at $1 per share, the trustee contends that LaGroux's bankruptcy estate should have been offered the opportunity to purchase Mr. Simmons's shares in AllCare for $1 when Mr. Simmons withdrew on June 9, 2017. AllCare's operating agreement states that the remaining members may "elect to purchase the interest of the withdrawing [m]ember . . . on a pro rata basis" (Operating Agreement Paragraph 22). In addition, pursuant to Ohio Revised Code Section 1705.161, "[u]pon a member's withdrawal from a limited liability company, the member's right to participate in the management and conduct of the limited liability company's business terminates."

The Court has determined that LaGroux resigned on November 3, 2016, when he sent his resignation email. After that resignation, LaGroux was no longer a member with the right to purchase shares and did not have the right to participate in the conduct of AllCare, which presumably would include purchasing other members' shares. Therefore, LaGroux did not have a right to be offered the opportunity to purchase Mr. Simmons's shares when Mr. Simmons resigned on June 9, 2017. Because the debtor's bankruptcy estate cannot possess more than the debtor did outside of bankruptcy, *see Tempnology*, 139 S. Ct. at 1663, LaGroux's

20

bankruptcy estate also did not have a right to be offered the opportunity to purchase Mr. Simmons's shares in AllCare.

*C. Domain Names*

Upon the commencement of a bankruptcy case, all property of the debtor comes into the bankruptcy estate, regardless of whether the interest in such property is legal or equitable.  11 U.S.C. § 541; *Taylor v. Freeland & Kronz*, 503 U.S. 639, 642 (1992) (all property becomes property of the estate at the filing of the petition).  However, 11 U.S.C. § 541(d) provides, in pertinent part:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

Section 541 "reiterates the general principle that where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest in the property."  *Gilbert v. Palmer Manufacturing and Supply, Inc. (In re Winkle)*, 128 B.R. 529, 533 (Bankr. S.D. Ohio 1991).  "While the nature and extent of the debtor's interest are determined by state law 'once that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate.' "  *Bavely v. United States, IRS (In re Terwilliger's Catering Plus, Inc.)*, 911 F.2d 1168, 1172 (6th Cir. 1990) (quoting *N.S. Garrott &*

21

*Sons v. Union Planters Nat'l Bank of Memphis (In re N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir. 1985)). Thus, if pursuant to state law the debtor only has bare legal title to the property, then only a legal interest becomes part of the debtor's estate. *Mason v. Clark (In re Book)*, Ch. 7 Case No. 11-62686, Adv. No. 12-6031, 2013 WL 5300694, at *2 (Bankr. N.D. Ohio Sept. 17, 2013).

The Court must decide whether LaGroux had an equitable interest in the domain names or whether he only had bare legal title and no equitable interest. On the one hand, LaGroux purchased these domain names under his own name originally and then renewed these domain names after filing for bankruptcy. AllCare did not reimburse LaGroux for his purchases at either time. On the other hand, many other facts established at trial indicate that LaGroux only held a legal interest in the domain names. The purchase and renewal costs that LaGroux paid were nominal, as LaGroux stated that he only paid between $7 and $14 to purchase each name. LaGroux provided the passwords to these domain names to Ms. Gobbi when she became a member of AllCare. LaGroux did not discuss the domain names at his 341 meeting of creditors and did not include the domain names as assets on his bankruptcy schedules until he amended his schedules roughly seven months after his 341 meeting of creditors. LaGroux did not use these domain names for personal use, but instead they were and still are used exclusively for

22

AllCare's purposes.  Finally, at trial, LaGroux explained that although he purchased the domain names, he believed the domain names were AllCare's and not his own.

The Court finds that although the domain names were in LaGroux's name, AllCare has established by a preponderance of the evidence that LaGroux held only bare legal title to the domain names.  If LaGroux truly believed that he owned more than a bare legal interest in these domain names, it is unlikely that he would have omitted them from his initial schedule of assets.  Because the Court finds that LaGroux only had bare legal title to the domain names, only the bare legal title is property of the bankruptcy estate.

Presumably, nothing prevents AllCare from filing a motion for an order of abandonment in the debtor's main bankruptcy case.  *See* 11 U.S.C. § 554(b) ("On request of a party in interest . . . , the court may order the trustee to abandon any property of the estate . . . that is of inconsequential value and benefit to the estate.").

### D. Next Steps

This memorandum of opinion is intended to resolve all remaining claims in AllCare's adversary complaint.  Presumably, now that the Court has held that the trustee is bound by the valuation procedures set forth in the operating agreement,

23

AllCare and the trustee will follow those procedures in good faith. *See*, *e.g.*, Operating Agreement at Paragraph 20 (withdrawing member, and now the trustee as successor-in-interest, must exercise dissociation in good faith and minimize any present or future harm to remaining members as a result of the withdrawal). Given the history of this litigation, the court has no illusions about the parties and their attorneys reaching a consensual resolution of their remaining disputes any time soon. Nevertheless, absent any stay pending appeal, the Court will simply caution the litigants and their attorneys that noncompliance with Ohio law or the operating agreement could be grounds for possible damage claims. *See also Celotex v. Edwards,* 514 U.S. 300, 313 (1995) ("it is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected") (citations omitted). The Court makes no determination as to the merits of any future disputes that may arise in the course of the valuation process.

## CONCLUSION

For the reasons stated above, the Court finds that (1) LaGroux's bankruptcy estate only has an economic interest in AllCare because LaGroux withdrew from AllCare prior to filing for bankruptcy, (2) Ohio law and the operating agreement

24

control LaGroux's estate's interest in AllCare, and the trustee must comply with the terms of Ohio law and the operating agreement regarding valuation and sale, and (3) LaGroux's estate has only a bare legal interest in the eight domain names.

IT IS SO ORDERED.